Filed 2/9/26  In re Felipe V. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re FELIPE V., a Person Coming Under the Juvenile Court Law. | |
| THE PEOPLE, | D083982 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. JJL000920) |
| FELIPE V., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Imperial County, Poli Flores, Jr., Judge.  Affirmed as modified.

Jared G. Coleman, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Randall D. Einhorn and Andrew S. Mestman, for Plaintiff and Respondent.

Defendant Felipe V. was found to have committed an attempted murder and other related crimes arising out of a gang-related shooting in a Calexico neighborhood. He challenges the sufficiency of the evidence to support an enhancement based on a finding that the crimes were committed for the benefit of a criminal street gang. He also asserts that imposition of a restitution fine is now precluded by subsequent legislation. The People concede error in both respects. Accordingly, we modify the judgment to strike the gang enhancement and vacate the restitution fine. As modified, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

In October 2023, there was a shooting at a residence located in La Garra Sur (LGS) gang territory in Calexico. The residence had a main house and a garage that had been converted into a studio apartment. Maria C. lived in the main house with her daughter and five grandchildren. Joshua L. lived in the studio.

Police received a call about possible shots fired at the residence around 4:50 p.m. When the officers arrived, they contacted Fernando Fernandez and Carlos Ramos in the driveway. They denied hearing or seeing anything suspicious. Fernandez is a member of the Kennedy Gardens Sur gang and Ramos belongs to the Ghost Town Locos gang.

The officers proceeded to search the area, finding a makeshift Molotov cocktail in the street, three .40 caliber casings near the residence, and one bullet in the driveway. They found a second bullet that had traveled through the studio and into the main house, coming to rest in a kitchen wall. Maria confirmed she was home with her grandchildren during the shooting. She heard three pops, a loud explosion, and then "a bullet bouncing around inside of her residence."

2

The neighbors similarly reported hearing three "pops" followed by a loud explosion. One neighbor witnessed the shooting from the front window of her home. She told the police that she saw "four Hispanic males" standing in front of the residence. At least three of them appeared to be juveniles, and one of them was wearing a blue shirt. The neighbor heard an argument, during which someone shouted, "La Garra!" The male in the blue shirt brandished a firearm and pointed it towards her neighbors at the residence. Then, another male took the gun from the male in the blue shirt and began shooting.

The police gathered surveillance videos from the residence and another neighbor. The videos show Fernandez and Ramos working on a vehicle in the driveway of the residence. Around 4:15 p.m., a young male wearing a gray hat, blue shirt, and dark pants rides his bicycle eastbound toward the residence. Although it is difficult to discern exactly what they are saying, there appears to have been some dispute between the young male and Fernandez and Ramos. The young male then leaves, heading west, while yelling, "LGS, homie!" back at the residence.

A short time later, Joshua L., Benito Juarez, and Damian Mejia join Fernandez and Ramos in the driveway. Then a group of four males—including the young male wearing the blue shirt—approach the residence on foot, shouting phrases like, "LG gang, homie!" and "Fuck G-Town, ese!" There is another argument between the two groups, a Molotov cocktail is thrown from the driveway area, and then someone from the group of four fires several shots. After the explosion and shots, Fernandez and Ramos's group yells, "Fuck La Garra!"

An officer interviewed Joshua at the residence the evening of the shooting and at the police station the following day. In his interview at

3

the residence, Joshua claimed he was not home during the shooting. But "they"—presumably, Fernandez, Ramos, Juarez, and/or Mejia—told him there were four people involved in the shooting. Joshua reluctantly told the officer the young male in the blue shirt was Felipe, also known as "Youngster." He eventually identified the cohorts as "Choco," who was young as well, "Conejo," who was "an OG," and "Cuete," who was a "big homie." Joshua confirmed that "everything started because of" Felipe, who pulled a gun on Ramos and asked, "Where you from?" When Ramos replied, "Ghost Town," Felipe went and got his "big homies." Joshua understood there was only one gun used during the shooting, but he did not know who the shooter was.

In his second interview at the police station, Joshua admitted he was actually in the driveway when the shooting happened. At one point, he stated that everyone in the group of four had guns, but only one person shot, and he was not sure who the shooter was. Later in the interview, however, Joshua said that Felipe "probably handed the gun to [Choco]." He explained that Conejo and Cuete had "beef" with Ramos, and Felipe and Choco were Conejo's "little hitmen" who patrolled the neighborhood looking for rival gang members.

The prosecution filed an amended juvenile wardship petition alleging that Felipe committed attempted murder (Pen. Code,[1] §§ 664, 187, subd. (a); count 1), conspiracy to commit murder (§ 182, subd. (a)(1); count 2),[2] and shooting at an inhabited dwelling (§ 246). It was further alleged that all

_____

[1] All statutory references are to the Penal Code unless otherwise indicated.

[2] The prosecution alleged the following overt acts: "gathered in a residential area, possession of a firearm, exhibited firearm, [and] discharged firearm."

4

three offenses were committed for the benefit of, at the direction of, and in association with a criminal street gang (§ 186.22, subd. (b)(1)).

The jurisdictional hearing took place in January 2024. Joshua testified the day of the incident, he woke up around 4:00 p.m. and went outside "a while" after that. He saw a group of people standing in the street arguing with Fernandez, Ramos, Juarez, and Mejia. Someone from Fernandez and Ramos's group threw the Molotov cocktail, then someone from Felipe's group started shooting. Joshua felt two bullets pass by the sides of his head.

Joshua claimed he never saw the faces of the other group. When the prosecutor reminded him that he previously identified all four group members, Joshua insisted, "I never seen them and I never heard about them." He claimed he was simply repeating what his own group told him, and he was now unsure whether he identified the correct people. Asked to confirm that all four group members had guns, Joshua said that was incorrect and he only said that because he wanted to leave the police station. He denied seeing Felipe pointing a gun at the residence. He claimed it was all a misunderstanding. He denied knowing why Felipe's group came and shot at them. He did not see who had guns or who shot. He did not hear anything Felipe's group said.

Joshua admitted he did not want to testify in this case. He feared for the safety of his family. Asked whether he feared repercussions from LGS, he said, "Probably. I don't know."[3]

The prosecution also presented gang expert testimony at the hearing. According to the expert, Calexico currently has about five active gangs, including LGS, Ghost Town Locos, and Kennedy Gardens Sur. LGS has existed for more than 30 years and is the most violent gang in town. LGS's primary activities include narcotics sales and the trafficking of undocumented immigrants.

Most LGS members are juveniles, as they can easily be persuaded to "put in work" for the gang and suffer fewer consequences when they are caught. The group of four in this case—Sam Lemus (Conejo), Michael Jimenez (Cuete), Felipe (Youngster), and Jason B. (Choco)—are confirmed and/or admitted LGS members. Lemus is the "shot caller" and Jimenez is his right-hand man.

The expert testified that, at some point in time, the police responded to a report that Lemus was brandishing a firearm and making criminal threats. During a search of his vehicle, a loaded firearm was located, and he was arrested. Jimenez had been investigated for multiple assaults with a deadly weapon, gun possession, narcotics sales, robberies, witness intimidation, and other crimes. In October 2018, the police executed a search warrant at Jimenez's house and found narcotics, a loaded firearm, and "gang-related

---

[3] The prosecution had difficulties securing Joshua's attendance at the jurisdictional hearing. Before the hearing, he told an investigator that he would not come to court and testify. The prosecution was then unable to locate him for some time. The trial court issued a subpoena authorizing law enforcement to bring Joshua to court. He disappeared again during the hearing, just before he was set to testify. The court issued a bench warrant and continued trial until he appeared late the following morning.

insignia" such as "LGS" and "La Garra" graffiti. In August 2021, Jimenez and other LGS members visited an individual who was cooperating with the police in a murder investigation. According to the expert, the group "held [the witness] at gunpoint, robbed him, burglarized his home, threatened him, and pretty much told him if he kept cooperating with police, there would be consequences."

Upon reviewing surveillance videos in this case, the expert determined this was "two rival gangs going at it. Obviously, there was a dispute, and they were confronting the rival gang." The expert said it was common for LGS and Ghost Town to engage in violent altercations. Asked how the altercation would benefit "one or the other gang," the expert explained: "When one gang gets disrespected or, you know, something happens to one of their gang members by another gang, obviously, they have to abide by their gang rules, and they have to retaliate and . . . commit crimes on behalf of the gang." "Part of that is just intimidating the other gang or the other individual, and, in this case, it obviously went further than that. But they have to represent their gang and show force to, you know, keep their standing with the gang members."

The juvenile court ultimately sustained all counts and allegations against Felipe. The court found Joshua's statements during the police station interview to be the most credible, noting he seemed relaxed, calm, and direct in his responses at that time, whereas he was evasive during the hearing. The court realized there were "probably a lot of reasons why he was reluctant to testify" at the hearing. Accordingly, it credited his initial identification of the male wearing the blue shirt as Felipe.

As to the attempted murder allegation, the court found Felipe liable under an aiding and abetting theory. The court highlighted the evidence

that, following his initial confrontation with Fernandez and Ramos, Felipe returned to the residence with three other LGS members, there were "verbal exchanges where they spouted . . . their respective gangs"—which are "fighting words" in "gang culture"—and then Felipe "pass[ed] that weapon to another cohort among the four." The court further explained that it was convinced this was an attempted murder, as opposed to a drive-by shooting or simple discharge, insofar as Joshua testified that two bullets whizzed right by his head.

The court sustained the conspiracy allegation, finding evidence of an agreement to commit the shooting inferable from the conduct of Felipe and his cohorts. Specifically, the court pointed out that "the persons involved in the conspiracy weren't just random individuals" but LGS members who came to the residence together at Felipe's request with the common purpose of confronting Fernandez and Ramos. It emphasized that the four men "came back together" and "acted together as a group."

With respect to the allegation of shooting at an inhabited dwelling, the court cited the evidence that at least one bullet struck the residence. It further determined that "anyone with common sense would have" known the residence was inhabited since Fernandez and Ramos were outside working on their car, and Lopez had exited from the garage/studio.

Finally, the court was also satisfied that all three offenses were committed to benefit and promote the LGS gang based on the evidence that Felipe and his cohorts claimed their gang and disparaged the Ghost Town and Kennedy Gardens gangs before the shooting.

At the dispositional hearing, the juvenile court declared Felipe a ward of the court pursuant to Welfare and Institutions Code section 602 and committed him to Imperial County's secure youth treatment facility (see *id.*,

§ 875).  The court determined the most serious recent adjudicated offense was the attempted murder, and set the baseline term of confinement at five years and the maximum term at 41 years, eight months.  It awarded Felipe 184 days of custody credit and ordered him to pay a $100 restitution fine.

Felipe filed a timely notice of appeal.  His appellate counsel initially filed a brief contending there was insufficient evidence that Felipe was involved in the shooting.  After the Attorney General filed his respondent's brief, however, appellate counsel filed a motion asking this court to strike his original brief and replace it with a *Wende* brief, indicating he now believed there were no reasonably arguable issues for reversal on appeal.  (See generally *People v. Wende* (1979) 25 Cal.3d 436 (*Wende*); *Anders v. California* (1967) 386 U.S. 738 (*Anders*).)  We granted the request and reviewed the entire record on appeal—including the exhibits transmitted to this court at the Attorney General's request—as mandated by *Wende*.

## DISCUSSION

Following our initial review, we filed an order requesting supplemental briefing on two questions:

1. Whether sufficient evidence supports the true findings on the gang allegations and, in particular, whether the record contains substantial evidence showing La Garra Sur's members "collectively engage in, or have engaged in, a pattern of criminal gang activity" within the meaning of Penal Code section 186.22, subdivision (f). (See, e.g., *People v. Clark* (2024) 15 Cal.5th 743, 761–763; *People v. Shively* (2025) 111 Cal.App.5th 460, 468–470.)

2. Whether the $100 restitution fine must be stricken in light of the amendments that Assembly Bill No. 1186 (2023–2024 Reg. Sess.) made to Welfare and Institutions Code section 730.6 effective January 1, 2025.

9

In response, the Attorney General filed a supplemental brief conceding that "even viewing the evidence in the light most favorable to the judgment, the evidence is insufficient to support the true findings on the gang enhancement allegations." He also agrees that Assembly Bill No. 1186 applies retroactively to this case such that the $100 restitution fine should be vacated. We find the concessions well taken and we accept them.

## A. *Gang Enhancement*

The trial court determined that all three crimes of which Felipe was convicted were "committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" in violation of section 186.22, subdivision (b)(1). Effective January 1, 2022, section 186.22 was amended by Assembly Bill No. 333 (Stats. 2021, ch. 699), significantly narrowing the circumstances in which the enhancement would apply. (See generally *People v. Clark* (2024) 15 Cal.5th 743, 752–753.) As amended, the statute now requires, among other things, that the two so-called "predicate offenses" necessary to establish a "pattern of criminal gang activity" must each have been committed within a specified date range by two or more gang members for the "common benefit" of the gang, and this benefit must have been "more than reputational." (*Id.* at p. 752.) Here, the evidence of predicate offenses offered by the prosecution showed three possible crimes, two of which were committed by a single gang member (Jimenez or Lemus) without anything to indicate a value to the gang that was more than reputational. This is insufficient to establish a basis for the gang enhancement as amended by Assembly Bill No. 333.

**B.** *Restitution Fine*

Effective January 1, 2025, Welfare and Institutions Code section 730.6 now prohibits imposition of restitution fines on juvenile offenders. (Stats. 2024, ch. 805 § 6.) The Attorney General concedes this legislation should be given retroactive effect under the principles of *In re Estrada* (1965) 63 Cal.2d 740. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308.) We therefore vacate the $100 restitution fine.

### DISPOSITION

The juvenile court is ordered to strike the gang enhancement imposed pursuant to section 186.22 and to vacate the restitution fine previously imposed pursuant to former Welfare and Institutions Code section 730.6, subd. (a)(2)(A). As so modified, the dispositional order is affirmed. The matter is remanded so that the court may reconsider the term imposed. In any event, the court must recalculate and specify the maximum term of confinement. (See Welf. & Inst. Code, § 726, subd. (d) & 731, subd. (b); Cal. Rules of Court, rule 5.795(b).)

DATO, J.

WE CONCUR:

O'ROURKE, Acting P. J.

IRION, J.

11